Davis *v.* Lowden.

## GRACE E. DAVIS

*v.*

## JOHN J. LOWDEN, guardian of Lester Roscoe Davis.

[Filed October 30th, 1897.]

1. It is provided by statute that, until dower be assigned to her, "it shall be lawful for the widow to remain in and to hold and enjoy the mansion-house of her husband, and the messuage or plantation thereto belonging, without being liable to pay any rent for the same." Decedent, with his family, occupied part of his building as a dwelling, and rented the remainder as a store to a firm of which he was a member, and as a dwelling for his copartner.—*Held*, that he had not been in such possession of the portion of the building so rented as would enable his widow to *remain* in possession thereof under the statute.

2. Where a widow has signed a lease to a third person for premises belonging to deceased's estate, under which the tenant has taken possession and remains in possession, she is estopped from claiming the whole of the rents of such leased premises under her right of quarantine, although the lease was never executed by the executor or by the guardian of the minor heirs, it having been acquiesced in by them.

Bill for dower.   Heard on pleadings and proofs.

*Mr. Patrick H. Gilhooly*, for the complainant.

*Mr. Joseph Cross* and *Mr. John J. Lowden*, for the defendant.

PITNEY, V. C.

This is a bill by a widow against the heir-at-law of her husband asking that dower be set off to her; also asking for rents and profits of premises in which she claims a quarantine, until dower shall be set off.

The facts are as follows: The husband, Lester Davis, died on the 23d of June, 1896, testate of a will in which he gave to the complainant $2,000 in addition to her right of dower in his real estate.   He devised all the rest of his estate, real and personal, to his son, Lester Roscoe Davis, an infant under the age of fourteen years, the issue of a prior marriage.

The testator died seized of several pieces of real estate, none of which, as appears from the evidence and statements of counsel, was of any considerable value, except a lot of land on the corner of Third and Fulton streets, in the city of Elizabeth, upon which stood a large building, fifty feet front by ———— feet deep, three stories high.   The main floor, to the full width of fifty feet, was designed and used as a mercantile store and salesroom.   The second and third floors were designed and used mainly for dwellings, but one or two rooms on each floor were used for storage of goods in connection with the store below. The dwellings were reached by two routes—one an open stairway from the centre of the open storeroom, and another a private stairway leading from Fulton street at the side, furnished with two door-bells—one for the second, and one for the

third floor.  The dwelling-rooms on the second floor and two of those on the third floor were occupied by Mr. Davis and his family, and the remaining dwelling-rooms on the third floor were occupied by Mr. Jayne (his business partner) and family.

Mr. Davis erected this building about the year 1890 or 1891 for his own use, and designed and arranged it as above stated, and about that time he entered into a contract of partnership with Mr. Jayne for the carrying on of a hardware and paint business.   The whole building, with stable, &c., in the rear, was rented to the firm of Davis & Company, composed of Mr. Davis and Mr. Jayne, at $1,000 a year, with the understanding that each partner was to have the privilege of living in the dwelling-rooms over the store in the manner above stated.

At the death of Mr. Davis, in June, 1896, his partner, as survivor, continued the business and arranged with the executor to purchase all of Mr. Davis' interest in the business, and, by a contract with the executor, rented the premises (except the living-rooms that had been occupied by Mr. and Mrs. Davis), for five years, at $750 a year.

Mr. Lowden was at that time the counsel for the executor, and under the mistaken notion that the executor had power to execute a lease for the premises, he prepared a lease from the executor and Mrs. Davis, the complainant, as widow, to Mr. Jayne, for the whole premises,

"excepting the nine rooms on the second floor and the two rooms on the third floor, which are now in the use and occupation of the widow and family of the said deceased,"

for the term of five years from the 11th of August, 1896, at the rent of $750 a year, in monthly payments of $62.50 on the 11th day of each and every month.   The lease provided that the widow and family of the deceased should have the right and privilege of keeping coal and wood in the cellar for their household use, and a right of way and the use of the stairway.   It further provided that the apartments of the widow should be heated as theretofore by the steam-heating apparatus then in the said building, without expense to the widow and family of the

Davis *v.* Lowden.

deceased. There was a further provision that in case the widow and family chose to vacate the premises reserved for them, the lessee, Jayne, would take them at the rent of $250 a year. Then follows this:

"It is hereby understood by and between the parties hereto that the rents hereby reserved and made payable to the said Mack, executor as aforesaid, shall be divided, after payment of lawful charges against the same, between the parties of the first part in the proportions to which they may be entitled by law, and that payment to the executor shall operate as a release of all liability on the part of the party of the second part for division of payment."

This lease was executed by Mrs. Davis, the complainant, and delivered to Mr. Lowden for the signature of the executor and Mr. Jayne. Then, upon consideration, Mr. Lowden concluded that the executor had no power to make such a lease, and himself afterward took out, from the orphans court, letters of guardianship of the infant; and, without any formal lease being executed, he has, as such guardian, acquiesced in and approved the lease just referred to.

One month's rent of the premises ($83) was paid by the executor to the complainant, and after that various sums were paid to her monthly, up to and including November, 1896, aggregating, with the first payment of $83, $318. For this sum the complainant receipted, with this clause added:

"I also agree that if my dower interest should not amount to said sum of $318, or such sum and such other subsequent payments as may be made to me, that the excess over my dower interest thus received shall be paid out of the legacy to me in the last will of said Lester Davis, deceased."

The widow now claims by her bill that she is entitled to the whole of the rents of the store and dwelling until dower is actually admeasured and set off to her, basing her claim upon the second section of the Dower act, which provides

"that until such dower be assigned to her, it shall be lawful for the widow to remain in and to hold and enjoy the mansion-house of her husband and the messuage or plantation thereto belonging, without being liable to pay any rent for the same." *Gen. Stat. p. 1276.*

9

Three questions arise upon the case and were discussed by counsel:

*First.* Did the first floor and the stable and building in the rear, which were occupied by the firm of L. Davis & Company for mercantile purposes, form a part of the dwelling? Are they included in the language " mansion-house of her husband " or in the language " messuage thereto belonging ? "

*Second.* If so, then was the husband in such possession of them that the widow could be said to " remain " in possession thereof, and thereby bring herself within the terms of the act?

*Third.* What effect does her signature of the lease above recited have upon her right under the second section of the Dower act above quoted?

The first question is not without difficulty. The word " messuage," as used in *Magna Charta* and all the older authorities, meant simply a mansion-house. It has been extended by later use to include other structures; but, so far as I am able to find, the structures which may be properly included within its meaning are such only as are useful in making the occupation of the mansion-house itself more comfortable and beneficial. See *Jac. L. Dict.* and *Bouv. L. Dict. tit. " Messuage."* In the *Encyclopedic Dictionary* the definition is, " a dwelling-house with the adjacent buildings and curtilage appropriated to the use of the household ; a manor-house." To the same effect is the *Century Dictionary.*

The language of our statute is broader than that of *Magna Charta* in that it gives the right to " remain in, hold and enjoy the mansion-house of her husband, and the messuage or plantation thereto belonging." In the older cases it was held that under the term " messuage " a small quantity of land might be included. In our statute the word is used in the alternate— " messuage or plantation "—indicating that the legislature had in mind a small piece of land, such as a garden or yard, rather than a building.

In Indiana (*Williamson* v. *Ash, 7 Ind. 495*) it was held, in a case precisely like the one in hand, that the widow was not entitled to quarantine in a storeroom. The report states that

Davis *v.* Lowden.

Isaac Ash owned a building, erected and used in parts for two purposes—one part for a dwelling and one for a mercantile storeroom. After his death his wife continued to occupy the dwelling-house. The heirs took possession of and rented the storeroom. After a year or more the dwelling and storeroom were set off to her as dower. Then she sued Williamson, who had been the tenant of the heirs, to recover the rent of the storeroom from the time of her husband's death. The Quarantine act in force in Indiana at that time was this :

"Until such dower shall be assigned, it shall be lawful for her to remain and continue in the mansion-house and messuage thereto belonging, without being chargeable to pay the heir any rent for the same."

The court held that " the right to occupy the dwelling did not extend to the storeroom. It was not appropriated to nor in any way necessary for the use or convenience of the dwelling-house," citing *Grimes* v. *Wilson, 4 Blackf. 331,* where the court used this sensible language : " It is difficult to define with precision the signification of the legal term *messuage*. Authors have differed in their understanding of its import. The best writers, however, represent it as synonymous with house, and as embracing within its meaning an orchard, garden, curtilage, adjoining buildings and other appendages of a dwelling-house." By this, I understand, is meant something which renders the occupation of the dwelling as such more comfortable and beneficial. This definition excludes a store and salesroom. The report of *Williamson* v. *Ash* does not state whether the storeroom in that case was under or adjoining the dwelling-rooms, but I am unable to perceive that the relative location of the rooms under the same roof makes any difference, since it is well settled that there may be separate ownership as well as tenancy of different floors of the same building.

But I do not find it necessary to determine this question, as I conclude that the complainant must fail upon the second question, the resolution of which against her is fatal to her claim.

The first floor was clearly in the possession of Mr. Davis and his partner, Jayne, as partners, and such possession was held by

them, not as ordinary tenants in common, but as joint tenants, with right of survivorship in trust for the purposes of the partnership. So that when Mr. Davis died his partner had an actual right as his survivor to the possession of those premises for some considerable period. The only question is for how long. The case shows that there was no written lease between the parties, and the evidence does not disclose that there was any particular term fixed. There were written articles of partnership, which, however, were not produced. The presumption from the facts as shown would be that the term would continue at least during the term of the partnership. In the absence of the element of partnership the presumption would be that the holding was from year to year, to be terminated on three months' notice. And it seems to me that this presumption is not necessarily overcome by the fact that the partnership was liable to be dissolved by the death of one partner, and in fact was so dissolved during the term. Such dissolution was only to the extent of preventing the surviving partner from making new contracts which should bind the firm. He still had the right, as surviving partner, to the possession of the partnership assets for the purpose of winding up the partnership affairs, and among those assets was the right of possession of this store. And it seems to me that, as a matter of necessity, that right of possession must continue long enough, at least, to enable him to wind up the business, he, of course, continuing to pay the rent.

I find it quite impossible to hold that the heir-at-law had the right to the actual possession of the premises immediately upon the death of his father, since the right on the part of the surviving partner must be held to be exclusive of the right of the heir-at-law and also of the widow. I am unable to see how the testator can be said to have had such a possession of the store-room floor as that his widow can be said to "remain" in possession. It seems to me that the situation is precisely the same as if the husband had leased the premises to a third person.

That being the situation, it seems to me that there can be no quarantine of the part so leased. The language of the act, "to remain in and hold and enjoy," indicates a continuation of the

actual possession and occupation of the husband, and confines the quarantine to houses and lands in his actual use and occupation, and hence necessarily excludes those not so in his actual use and occupation, and also excludes the idea of a constructive possession by a reception of the rents of leased premises. Such I understand has always been the construction put upon it.

The words "remain in," found in our statute, are taken from *Magna Charta, ch. 7, " et maneat in capitali messuagie mariti sui,"* and are therefore to be accorded the same meaning as has been given to the same words in that instrument.

I have examined all the English authorities (*1 Co. Litt. 34 b; 2 Co. Inst. 16, 17; Bac. Abr.; Com. Dig.; Vin. Abr. tit. "Dower"*) and can find no warrant for the notion that the widow is entitled to quarantine of anything of which her husband was not, at his death, in the actual possession and occupation as distinguished from possession by the receipt of rents, or that the right of quarantine could, under any circumstances, include the right to receive the rents of premises held under lease from the husband. Lord Coke (*1 Co. Litt. 34 b*) says:

"This continuance of the widow in the capital messuage is, in law, called a quarantine. * * * If the heir or other tenant of the land put her out she may have her writ *de quarantina habenda.*"

See *1 Rop. H. & W. 386; 1 Bright H. & W. 363; Fitz. N. B. 162, 363*, where we find this language:

"The writ of *quarantina habenda* lieth where a man dieth seized of any messuage and lands, &c., and immediately after the death of the husband, the heir, or he who ought to have the lands after his death, *will put the wife out of the messuage, &c.*, then the wife shall have this writ, for by the statute of *Magna Charta, ch. 7,* the wife shall remain in the capital messuage after the death of her husband by forty days, if it be not a castle."

In our own reports I can find no intimation of any right of the widow to hold, as a part of her quarantine, lands not in the actual use or occupation of her husband at his death or of any right to demand and receive rents of rented properties.

In *Den* v. *Dodd, 1 Halst.* *447, Chief-Justice Kinsey (at *p.* *450*) says: "We are warranted in saying that, although the

widow, when out of possession, cannot legally enter until her dower is assigned to her, yet, when she came upon the property during the lifetime of her husband and remained there subsequent to his death, the heir, or one claiming under him, cannot maintain an ejectment against her and oust her, without assigning to her that proportion of the estate to which she is legally entitled, and that is the point to which the present defence is limited."

In *Den* v. *Bilderback, 1 Harr. 497* (at *p. 506*), Mr. Justice Ford uses this language: " The doctrine stated in the case of *Den* v. *Dodd,* that a widow, remaining in possession from her husband's death, shall have her quarantine continued until dower is assigned to her, and cannot be dispossessed by ejectment till that is done, either at the suit of the heir or any other person claiming under the husband subsequent to the marriage, was founded on the common law, and two years afterwards the same principle was enacted by statute (*Rev. L. p. 397* § *21*), that until dower be assigned to the widow it shall be lawful for her to *remain* in the mansion-house and plantation without rent; but neither of them *compels* her to remain; she may give up the possession voluntarily, and go when and where she pleases, it being a personal privilege to herself; and if once she moves out voluntarily and departs, it is gone forever under the statute and her dower is reduced to a naked right, only to be recovered by an action at law."

In *Craig* v. *Morris, 10 C. E. Gr. 467,* it was held by Chancellor Runyon that the widow who continues in possession of her husband's mansion-house after his death may rent out the same and receive the rents, and that thereby she does not lose her right of quarantine    But this right is based upon a continuation of the husband's possession, and falls short of holding the doctrine contended for by complainant.

I should have supposed the principle above stated to be too clear for argument but for two cases cited and relied upon by the counsel for the widow, to wit:

*Conger* v. *Atwood, 28 Ohio St. 134; 22 Am. Rep. 362.* The head-note of that case is precisely the same as that of *Craig* v.

*Morris.* The case arose on demurrer to the petition, and one of the allegations of the bill is this: that at the time of the death of the decedent, his son-in-law was occupying the mansion-house and lot under an agreement between them that the decedent should retain his home there as part of the consideration for the use and occupation of the premises, and should receive from Dressler, the son-in-law, certain rents besides; and by an understanding between Dressler and the administrator that Dressler should pay him a reasonable rent, said use and occupation was continued for some time afterwards, and it was for the recovery of this rent that the action was brought by the widow. There was also a distinct allegation that at his decease the husband owned and *occupied* the house. The court, in its opinion, quotes the Ohio Quarantine act, and which provides that the widow " shall remain in the mansion-house of her husband free of charge for one year after his death, if her dower be not sooner assigned her," and proceeds:

" Does the petition show a case entitling her to the benefit of this provision? Some of the averments in the petition are not entirely clear, but no motion having been interposed to make them more definite and certain, we must interpret the petition according to its true import and meaning.

" It is averred that the decedent, at the time of his death, owned and *occupied* the mansion in question. This averment must be kept in mind in connection with the further averment that the house was also then *occupied* by another person. The two statements are not necessarily inconsistent, nor does the latter invalidate the former. The more essential inquiry is whether the occupancy of the tenant, under the decedent, interfered with the right of the widow to the exclusive occupancy of the mansion-house after the death of her husband.

" From the fact that the rent of the tenant was to be paid partly by the occupancy of the decedent, it is fairly inferable that the renting to him was at most *during the life of the decedent only;* and this conclusion becomes incontrovertible, as the case now stands before us, from the fact that after the death of the husband the tenant continued in the mansion, so far as appears,

only under an arrangement made by him with the administrator. Moreover, his occupancy terminated shortly after the death of the husband and within the period in controversy. There was then no legal obstacle to the widow's enjoyment of the mansion-house of her husband as provided by the statute."

This statement shows that the case was put upon the ground that the husband was in effect in possession at his death, and that the wife's possession was a mere continuance of his. The decision was by a divided court, and the case had met with varied fortunes in the court below. The conclusion of the court, at the end of the opinion (at *p. 369*), is as follows: " The right of a widow to remain in the mansion-house of her deceased husband, as provided by statute, is not restricted to a personal continuance in the house merely, but she is entitled to a reasonable enjoyment of the possession of the premises, and may, therefore, either personally enjoy them or she may rent them, as she may deem best promotive of her comfort."

I cannot look upon this case, either the decision itself or the reasoning upon which it is based, as sufficient authority to overcome what I consider to be the clear law of this state.

The other case relied upon by the complainant is *Orrick v. Robbins, 34 Mo. 226.* Mrs. Orrick, the plaintiff there, had been the widow of one Robbins, who died seized of a tract of land, a dwelling-house and grounds in his actual use and occupation. Adjoining this land, on the same tract, was a field of sixty-six acres which, at Robbins' death, was rented out for a moneyed rent and in the actual possession of the tenant. After the death of Robbins, his widow, the plaintiff, continued to occupy the part of which he died in the actual occupation, without accounting to the estate for any rent thereof. She also received a proper share as dowress of the rent paid by the tenant of the sixty-six acres up to the expiration of the lease. This rent was received by the administrator under a statute of Missouri. He relet the sixty-six acres after the expiration of that lease, and the suit was by the widow to recover the whole of the rent of the sixty-six acres collected by the administrator from the end of the term in existence at her husband's death up to the time that her dower

was actually assigned to her.  It should be here stated that the widow, under a statute of Missouri, elected to take what is there called a "child's share" in place of her dower, and the principal question discussed in the briefs of counsel (printed in full in the report) was whether or not the right of quarantine was a mere incident to the right of dower, so that when the widow abandoned her right of dower and took in its place a child's share in the estate she deliberately abandoned her quarantine.  The argument against the widow was that her right of quarantine fell with her right of dower.  The question whether or not she was entitled to quarantine in the land of which her husband was not in the actual possession and occupancy at the time of his death was not discussed by counsel.  The court, in dealing with it, after holding in the widow's favor on the question discussed, uses this language: "If the owner of a plantation rent out a particular field or part of it, that is not necessarily a separation of the field or part from the plantation.  Whether it be or not is a question of fact for determination in each case.  If it be not permanently separated, yet the widow's right being merely possessory, and she being unable to have actual possession during the term created by the husband, she cannot have her quarantine of such rented part until the term shall expire, and then her right would immediately attach.  In this case, therefore, we think the widow's right in the rents collected by the administrator to be as follows: for the rents received for the unexpired term created by the husband, she was entitled only to a part thereof, in proportion to her general interest as dowress in the real estate, and from the time of the expiration of the term created by the husband, at the time of the assignment of her dower, she was entitled to the whole rent."

This reasoning seems to be inconsistent with itself and not satisfactory.  If the widow was entitled to any quarantine in the sixty-six acres held under a lease from her husband at the time of his death, she was entitled to the whole.  It is to be observed that the judgment in this case was a reversal of that appealed from.

In the later case of *McClurg* v. *Turner, 74 Mo. 45*, it was

distinctly and directly held that a widow could not have quarantine of a dwelling which was not in her husband's possession or occupation at his decease.

For these reasons I decline to follow those authorities and hold that the widow is not entitled, under a right of quarantine, to receive the rents from the storehouse or that part of the building occupied by the tenant.

But if I am wrong in this, I am unable to see how she is to escape the result of the lease signed by her. That was a distinct letting of the premises in conjunction with the executor, who was supposed at the time to represent the heir-at-law, to a third party for a term of five years, under which that person has remained in possession ever since; and although that lease was never executed by the executor or by the guardian of the heir-at-law, yet it has been acquiesced in by them and the tenant has been and still is holding under it. And I think that it must be held to have the same force and effect against the widow as if the proper party had joined with her therein. And if so, then she voluntarily joined in a conveyance of the premises in which she recognized the right of the heir therein. Such a conveyance was entirely inconsistent with the existence of her quarantine.

I will advise a decree in accordance with these views.